UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RICHARD A. GUZZARDO                     CIVIL ACTION

VERSUS                                  NUMBER: 10-00389

MICHAEL J. ASTRUE,                      SECTION: "S"(5)
COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits. (Rec. docs. 12, 13).

Richard A. Guzzardo, plaintiff herein, filed the subject applications for DIB and SSI benefits on July 14, 2006, with a protective filing date of June 21, 2006, alleging disability as of September 1, 2004.  (Tr. pp. 124-126, 127-131, 140).  In a Disability Report that appears in the record, the conditions

resulting in plaintiff's inability to work were identified as diabetes, right knee arthritis, and neuropathy in the feet. (Tr. pp. 155-162). Plaintiff's applications for DIB and SSI benefits were denied at the initial level of the Commissioner's administrative review process on September 14, 2006. (Tr. pp. 85-88). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") was convened on March 10, 2008 at which plaintiff appeared unrepresented by counsel. (Tr. pp. 89-90, 20-27). After being advised by the ALJ of his right to obtain representation, plaintiff elected to proceed in that fashion so the hearing was continued to a later date. (Tr. pp. 20-27). The hearing was re-convened on June 23, 2008 at which plaintiff, who was then represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 28-82). On June 26, 2008, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 8-19). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-4). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the

issues for judicial review as follows:

    I.    THE ALJ FAILED TO PROPERLY EVALUATE THE OPINION OF PLAINTIFF'S TREATING PHYSICIAN.

    II.   THE ALJ FAILED TO ACCOUNT FOR THE LIMITING EFFECTS OF PLAINTIFF'S OBESITY, AS REQUIRED BY SSR 02-1p.

(Rec. doc. 12-2, p. 10).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1. [t]he claimant meets the insured status requirements of the Social Security Act through June 30, 2009.

2. [t]he claimant has not engaged in substantial gainful activity since June 1, 2006, the amended onset date of disability (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. [t]he claimant has the following severe impairments: back disorder, obesity, osteoarthritis, degenerative joint disease of the right knee and diabetic neuropathy (20 CFR 404.1520(c) and 416.926(c)).

4. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with occasional climbing, kneeling, crouching and crawling, sitting for 1 hour at a time without interruption for a total of 6 hours in an 8-hour day, standing for 20 minutes at a time without interruption for a total of 1 hour in an 8-hour day, walking for 20 minutes at a time without interruption for a total of 1 hour in an 8-hour day but no climbing of ropes, ladders or scaffolds.

6. [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. [t]he claimant was born on December 28, 1960 and was 43 years old, which is defined as a younger individual, on the amended onset date of disability. (20 CFR 404.1563 and 416.963).

8. [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. [t]he claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 13, 14, 17, 18, 19).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the

Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C §405(g); Richardson v. Perales, 402 U.S. 389, 91 St.Ct. 1420 (1970).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

     A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled with the meaning of the Social Security Act.  Harrell v. Bowen. 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not

disabled.  Harrell, 862 F.2d at 475.  In making this determination,

the Commissioner utilizes the 5-step sequential analysis set forth

in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.

> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

> 4.  if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

> 5.  if an individual's impairment preclude him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determined if other work can be performed.

On the first four steps of the analysis, the claimant bears

the initial burden of proving that he is disabled and must

ultimately demonstrate that he is unable to perform the work that

he has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5,

107 St.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the

fifth step, the ALJ may establish that other work is available that

the claimant can perform by relying on expert vocational testimony

or other similar evidence to establish that such jobs exist.

Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195,

198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

As noted earlier, a hearing de novo before an ALJ went forward on June 23, 2008.  After the documentary exhibits were admitted into evidence, plaintiff's attorney gave an opening statement in which she argued that plaintiff was disabled due to severe back problems demonstrated through MRI and nerve conduction studies, severe diabetes requiring insulin and oral medications with neuropathy, and severe arthritis in the shoulders and knees. Counsel argued that plaintiff had worked up until the alleged onset date and had unsuccessfully attempted to go back to work 3 times subsequent to the onset date.  Although the severity of the findings were questioned by the ALJ, counsel suggested that the opinions of Dr. Genovese, plaintiff's treating physician, should be given controlling weight. (Tr. pp. 30-36).

Plaintiff then took the stand and was questioned by the ALJ. He was 47 years of age at the time and described himself as being 5'10" in height and weighing 280 pounds.  Plaintiff lived with his mother and son.  Prior to the alleged disability onset date of September 1, 2004, plaintiff had worked as a boilermaker and, prior to that, as a scaffold builder. Plaintiff testified that he, along

7

with 40 to 50 other employees, had been laid off from the boilermaker job several months before the alleged onset date. He had also worked for a construction company subsequent to September 1, 2004. When asked why he waited until June of 2006 to apply for Social Security benefits, plaintiff's attorney interjected and stated that plaintiff's condition had worsened after the onset date, that he was hospitalized in November of 2004 during which he was diagnosed with diabetes, and that it simply took some time for plaintiff to come to the conclusion that he could no longer work. Reference was made to a July 10, 2006 diagnosis of uncontrolled diabetes and counsel had found no mention of medication non-compliance in any of plaintiff's medical records. Plaintiff then testified that it was not until 2007 that his doctors had decided upon an effective insulin for his diabetes, Apidra. After further discussions with the ALJ, counsel agreed to amend the alleged onset date to June 1, 2006. (Tr. pp. 36-45, 49, 64).

Continuing, plaintiff testified that in February of 2008, he had worked at a restaurant for 4 weeks at 8 hours per day, 4 days per week, but that he finally had to quit due to fatigue, leg pain, and trouble with ambulating. Counsel then acknowledged that no argument was being made that plaintiff's condition satisfied the criteria of any of those set forth in the Listing of Impairments. In terms of daily activities, plaintiff testified that he

8

entertained visitors at his house once or twice per week and that he left his home to go visit others on the same basis.   He sometimes provided unspecified assistance to his wheelchair-bound aunt, grocery shopped, and attended church every Sunday, now being driven there by a new girlfriend who had recently taken him to a movie and visited him at home as well.   During the school year, plaintiff attended his son's school-related activities such as basketball practices, driving his mother's car to get there on a daily basis.   He also assisted his 75 year-old mother in babysitting his brother's three children (ages 7, 6, and 3) 4 days per week including taking the children to the library.   Plaintiff slept 8 to 9 hours per night, could attend to his own personal hygiene, and could cook, do laundry, sweep, and vacuum. He also grew tomatoes and helped maintain his mother's garden, played cards, read, watched TV, and went swimming in the summer months. Plaintiffs' mother attended to the financial matters and he went to the doctor monthly for monitoring of his diabetes and knee difficulties.

Plaintiff further testified that he was compliant with this diabetes medication regimen but that he did not exercise except for walking around his yard which was limited by leg/knee pain. Weight-controlling medication was said to be forthcoming from the doctor.   Plaintiff indicated that his weight fluctuated but that he

had lost 15 to 20 pounds in the past year.  He needed no assistive devices and did not have a handicapped parking permit.  When specifically asked by the ALJ, plaintiff testified that none of his doctors had placed any limitations on his activities but that dietary restrictions were not fully complied with. Medications included Topamax for his neuropathy and Naprosyn which plaintiff stated was not very effective but produced no side-effects.

Asked why he was unable to work, plaintiff testified that he had experienced pain and swelling in the feet for several years, right knee pain, back pain with standing and after sitting too long, and numbness in the buttocks.  Upon hearing this testimony, the ALJ remarked that plaintiff appeared to be comfortable and in no apparent distress despite being seated throughout the hearing.  Plaintiff initially described his pain level as an "8" on a 10-point scale but upon further questioning by the ALJ he reduced the level of pain to a "6".  Plaintiff experienced numbness in his feet and a bad feeling in his ankles.  He could lift/carry 12 pounds but then his feet and knee would hurt. He estimated that he could walk 50 yards before needing to rest but perhaps less of a distance if he was already standing.  At this point, plaintiff's counsel pointed out that Dr. Genovese, a practitioner at Lallie Kemp Hospital, and a consultative evaluator had found that plaintiff could not walk on his toes, heel-to-toe walk with his

right leg, or squat and had a decreased range of motion in his knee. The combination of plaintiff's knee problems, neuropathy in the feet, and radiculopathy caused plaintiff difficulty with walking, according to counsel.  Upon being tendered to his attorney for further questioning, plaintiff testified that he could not work due to foot problems on standing, leg and back pain, fatigue, and hand numbness causing him to drop things. (Tr. pp. 45-75).

Crystal Younger, a VE, was next to take the stand.  She first classified plaintiff's past work as a pipefitter as heavy, skilled; his work as a boilermaker as heavy, skilled; his work as a scaffold builder as medium, skilled; and, his brief stint of work as a short-order cook as light, semi-skilled.  The ALJ then posed a hypothetical question to the VE which assumed a person of plaintiff's past work experience who could lift/carry 10 pounds occasionally, 5 pounds frequently; could sit for 1 hour at a time and a total of 6 hours per 8-hour workday; could stand/walk for 20 minutes at a time and a total of 1 hour in an 8-hour workday, with the total time of sitting, standing, and walking, excluding breaks, equaling or exceeding 8 hours per day. The individual further required the opportunity to alternate between sitting and standing positions every 60 minutes for 2 to 3 minutes to alleviate his symptoms; could occasionally kneel, crouch, and crawl; could perform activities such as shopping and could travel without

assistance; could walk without assistive devices and could walk a block at a reasonable pace on uneven surfaces; could use public transportation; could climb a few steps at a reasonable pace with the use of a single handrail; could prepare and consume a meal without assistance; could tend to his own personal hygiene, and, could sort, handle, and use (presumably) money. With the foregoing limitations in mind, the VE testified that the individual described in the hypothetical question would be unable to perform plaintiff's past work. However, the individual would be able to perform a number of sedentary-level jobs, including that of cashier, receptionist, and truck driver, with significant numbers of such jobs existing in the local and national economies. (Tr. pp. 75-79).

The VE was then tendered to plaintiff's counsel for additional questioning. To the hypothetical question that was initially framed by the ALJ, counsel added the requirement that the individual be able to take 5 to 10 minute breaks every hour due to pain or frequent bathroom trips. In answer to the hypothetical question as amended, the VE essentially admitted that anything more than the customary pair of 15-minute breaks during the day and a half-an-hour to hour for lunch would make maintaining a job difficult. To the hypothetical question as amended, counsel then added the opinion of plaintiff's treating physician that he suffered from an extreme limitation in performing activity within

12

a schedule, in maintaining regular attendance, in being punctual with customary tolerances, in completing a normal workday and work week without interruptions from medically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Before the VE could give a formal answer, the ALJ interjected and acknowledged that such a person would essentially be unemployable. In reply, counsel emphasized that plaintiff had attempted to return to work on several occasions and was simply unable to maintain the pace of the jobs. While respecting counsel's position, the ALJ questioned whether plaintiff's testimony had sufficient objective support. (Tr. pp. 79-82).

The documentary evidence admitted in the administrative proceedings below begins with records from the South Baldwin Regional Medical Center's ("SBRMC") Emergency Room dated November 17, 2004 where plaintiff presented with complaints of weakness, shortness of breath, and nausea and vomiting for the previous several days. Various tests were run including an x-ray series of the abdomen which revealed gas in the large and small-bowel raising the possibility of mild ileus or gastrointeritis although the gut was not distended. (Tr. pp. 214, 208). Other test findings revealed plaintiff to have uncontrolled, insulin-dependent Type I diabetes, to be in diabetic ketoacidosis, and to be suffering from

dehydration.    Plaintiff  was  admitted  to  the  hospital  and  was administered  insulin  and  fluids  and  his  blood  sugar  eventually stabilized  and  his  vomiting  stopped.  (Tr.  pp.  197-200,  212-213). While he was hospitalized, plaintiff underwent an EKG which showed some  poor  R  waves  in  the  anterior  leads.  (Tr.  p.  201,  209).  An echocardiogram was also done which revealed normal left ventricular function,  mild  left  ventricular  hypertrophy,  and  mild  valvular regurgitation.  (Tr.  pp.  210-211).    Further  cardiological  work-up was to be obtained by plaintiff on an outpatient basis.  Plaintiff was  ultimately  discharged  on  November  21,  2004  with  a  diagnosis  of diabetic ketoacidosis and an abnormal EKG.  Medications at the time of   discharge   included   Lantus   insulin   to   be   administered subcutaneously  in  the  evening  and  regular  insulin  to  use  on  a sliding  scale.  (Tr.  pp.  201-207).

The  day  following  his  discharge,  plaintiff  proceeded  to  the Lallie Kemp Medical Center ("LKMC") Emergency Room in an attempt to establish a treatment relationship with a local doctor in light of the  recent  diagnosis  of  diabetes.  (Tr.  pp.  243-245,  248-250). Plaintiff  was  next  seen  at  the  LKMC  Outpatient  Clinic  on  November 30, 2004 and the diagnosis was diabetes, obesity, and hypertension. His  weight  was  recorded  as  265  pounds  on  this  date.   Diabetic education and eye and foot examinations were among the testing that was ordered and Avandamet and Avapro were prescribed. (Tr. pp. 246-

14

247).

Plaintiff was next seen at the LKMC Emergency Room on February 21, 2005 for complaints of fatigue, having missed his scheduled dose of Lantus the previous evening as well as his noon medications earlier in the day which he took at 3:00 p.m. instead. As a result of these medication regimen lapses, plaintiff had experienced a loss of consciousness earlier in the day while putting his tray up at lunch. Plaintiff weighed 261 pounds on this day. The diagnosis was syncope and insulin-dependent diabetes and medications were administered. An EKG was also performed and no adverse findings were reported. (Tr. pp. 237-242).

On June 14, 2006, plaintiff returned to the Lallie Kemp Emergency Room with complaints of weakness and dizziness. His weight was down to 225 pounds but his blood glucose was greatly elevated. Treatment with insulin reduced plaintiff's blood sugar but it remained high at 292. Among the battery of tests that were run that day were chest x-rays which revealed no evidence of active cardiopulmonary disease but showed some mild degenerative changes of the thoracic spine. Plaintiff was discharged home in improved and stable condition with a diagnosis of uncontrolled symptomatic hyperglycemia which had resolved. (Tr. pp. 225-236). Weighing 230 pounds, plaintiff returned to the Emergency Room on June 21, 2006 complaining of dizziness and poor balance. Treatment included

15

K-Dur and insulin.  The impression was a history of insulin-dependent diabetes with labile hyperglycemia.  Plaintiff was to follow-up with his physician in the Medicine Clinic. (Tr. pp. 217-224).

The next medical records document plaintiff's visit to the LKMC Outpatient Clinic on July 10, 2006.  Presenting complaints included numbness in the feet, right knee pain, and blurry vision but there was no shortness of breath or edema.  Plaintiff weighed 239 pounds and it was noted that he had stopped taking his medication a year earlier.  A physical examination revealed crepitus in the lateral aspect of the right knee.  The diagnosis was uncontrolled diabetes, diabetic neuropathy, and right knee pain. Neurontin was prescribed and plaintiff's other medications were re-prescribed.  A diabetic eye examination was to be obtained. (Tr. pp. 215-216, 283).

On July 14, 2006, plaintiff was interviewed by an Administration representative who completed a form denominated "Work Activity Report-Employee" after learning that plaintiff had earned wages subsequent to the initial alleged disability onset date of September 1, 2004.  During the interview, plaintiff reported that he had worked for a month as a boilermaker at J.V. Industrial, Ltd. in January of 2005 but was unable to continue due to problems with his blood sugar, legs, and swelling in the feet.

16

Plaintiff had worked for the same company again for a month in January of 2006 but had to stop due to similar symptoms. During these periods of employment, plaintiff indicated that he worked an average of 12 hours per day. The interviewer concluded that plaintiff's efforts were considered unsuccessful work attempts due to their brevity. (Tr. pp. 143-154).

On July 28, 2006, plaintiff completed the Administration's "Work History Report" form in which he described the duties and requirements of his past work as a boilermaker, pipefitter, and scaffold builder. (Tr. pp. 163-170). The following day, plaintiff filled out the Administration's form entitled "Function Report-Adult" in which he elaborated on his daily activities. Plaintiff described an average day as rising and sitting at the foot of his bed for 20 to 30 minutes to get feeling in his feet. He then cooked for himself and his son, following which he did small chores throughout the day to help out because he did not pay rent. Later, he cooked and cleaned again for himself before retiring for the evening. Plaintiff indicated that he cooked and cleaned for his son but was unable to work or to walk without experiencing pain in the feet and legs. He also indicated that his sleep was interrupted by visits to the bathroom, that it was difficult to put on socks and to get into and out of the bathtub, and that he experienced knee pain when using the toilet. Plaintiff prepared

17

complete diabetic meals for himself on a daily basis and although he took multiple breaks, he spent most of the day cleaning inside and outside of the house including doing laundry.  He was also able to go out of the house alone, which he did on a daily basis, but he did not drive at the time because his license had been suspended and due to vision problems.

Plaintiff was able to shop for himself but he did not take care of personal finances because his wife used to perform those functions.  Hobbies and interests included fishing 1 or 2 times per month from a sitting position, going to ball games with his son, and watching T.V.  Bending, standing, walking, kneeling, stair climbing, and seeing were all limited by plaintiff's feet and knee pain and shortness of breath.  Plaintiff estimated that he could walk for 20 to 30 yards before needing to rest for 5 minutes.  He could pay attention for up to 2 hours at a time and was able to complete tasks, to follow written and spoken instructions, and to get along with authority figures.  When walking long distances plaintiff used a cane and he wore glasses that had been prescribed in 2000.  In closing, plaintiff remarked that walking and seeing were the things that had affected him the most and he was unable to complete an 8-hour workday due to pain in the feet and legs and fatigue.  His blood sugar levels fluctuated for no reason.  Diabetes was accompanied by neuropathy to the feet and his right

18

knee was frequently painful. (Tr. pp. 171-178).

On August 15, 2006, plaintiff was consultatively evaluated by Dr. Obi Okoye.  Plaintiff advised the doctor that his blood sugar was typically in the range of 150 but that he had gone to the Emergency Room twice that month when his sugars had spiked to above 600.  Plaintiff additionally complained of nocturia, a constant dry mouth, and constant right knee pain which worsened with walking for long periods of time.  He described the pain as aching and at a level of "8" and associated with stiffness.  Plaintiff stated that he had last done construction work until February of 2006.  He could dress and feed himself, stand for 5 minutes at a time and for 2 hours per 8-hour workday, and sit in 1 place for 45 minutes. Plaintiff could drive for approximately 2 hours, walk about 50 feet, lift objects weighing 50 pounds, and was able to sweep, mop, vacuum, cook, wash dishes, and go grocery shopping.  Medications included Diclofenac, Glipizide, Lantus, Neurontin, Crestor, and Celebrex.

In the "Review of Systems" portion of his report, Dr. Okoye noted that plaintiff had experienced no syncopal episodes. Plaintiff's weight on this date was measured as 250 pounds and he was observed to ambulate well, to get on and off the examination table without difficulty, and to get up and out of a chair without any problems.  His abdomen was obese but was soft and non-tender.

19

Distal pulses were diminished but palpable, there was no edema or swelling, and gait was normal requiring no assistive devices for ambulation.  Grip strength was 5/5 in both hands and manipulation was intact.  Knee flexion was 120 degrees on the right and 150 degrees on the right and 150 degrees on the left.  Straight leg raising could be accomplished to 80 degrees on both sides on supination and to 80 degrees on both sides on sitting and plaintiff was able to lay straight back on the table without having to roll. Plaintiff was able to walk on his heels but not his toes and he could heel-to-toe walk with the left leg but not the right and he was unable to squat. A neurological exam was normal with sensation being intact.  The impression was diabetes, diabetic neuropathy, and degenerative joint disease of the right knee with some decreased range of motion but not requiring an assistive device. (Tr. pp. 251-254).

On August 24, 2006, Dr. Charles Lee, an Administration Medical Consultant, reviewed plaintiff's file as it was then extant and recorded his opinions in the Administration's "Physical Residual Functional Capacity Assessment" form.  There, Dr. Lee opined that plaintiff could occasionally lift and/or carry 20 pounds and could frequently lift and/or carry 10 pounds; could sit, stand, and/or walk for 6 hours per 8-hour workday; had an unlimited ability to push and/or pull; could frequently climb ramps/stairs, balance, and

stoop; could occasionally kneel, crouch, and crawl; could never climb a ladder/rope/scaffolds; and, had no manipulative, visual, communicative, or environmental limitations.   In rendering his opinions, Dr. Lee specifically referenced records from the LKMC Outpatient Clinic, the report from Dr. Okoye, records from plaintiff's Emergency Room visits, and the EKG results that were obtained during plaintiff's inpatient admission in November of 2004. (Tr. pp. 256-263).   Although he considered plaintiff's allegations of the existence of knee and foot pain and diabetes to be credible, the doctor's ultimate opinion was that plaintiff had the residual functional capacity to perform light work. (Tr. p. 255).

Plaintiff was next seen at LKMC on November 16, 2006, at which time his medications were adjusted, including an increase in Crestor, and additional testing was ordered. (Tr. p. 282). On December 11, 2006, plaintiff presented himself to the Lallie Kemp Emergency Room after accidentally closing the door on his right middle finger.  No fractures were noted on x-rays and plaintiff was treated and released.  His weight was measured as 270 pounds on this date. (Tr. pp. 267-273).  On June 6, 2007, plaintiff was seen by Dr. Charles Genovese of LKMC for complaints of poorly-controlled blood sugar.  He reported attending bible school where he was doing "great."  Topamax was substituted for Neurontin, Vytorin was

21

substituted for Crestor, and Naproxen was added. (Tr. pp. 280, 297). On June 13, 2007, plaintiff's glucose was somewhat high at 125. (Tr. p. 313).

Plaintiff returned to Dr. Genovese on June 19, 2007 and reported that the Topamax was not helping and that his right knee and shoulder experienced awful pain. X-rays of the knee and shoulder showed degenerative changes. The dosages of Topamax and Vytorin were increased. (Tr. pp. 279, 296). On June 26, 2007, an unidentified doctor at the Ascension Medical Clinic completed a "Report of Medical Evaluation" form that was devoid of any findings in which it was indicated that plaintiff should avoid lifting more than 20 pounds, avoid overhead work, and avoid squatting and climbing. The doctor recommended that plaintiff obtain an orthopedic clearance before the noted restrictions should be changed. (Tr. p. 281). Plaintiff was next seen by Dr. Genovese on June 28, 2007 to obtain a medical clearance to return to work, apparently having obtained a  job that did not involve heavy lifting. The presenting complaint was a right shoulder issue which was tender at the supraspinatus tendon. Plaintiff's blood sugar was greatly improved and generally ran around 100. Weight was measured at 273 pounds. His knee was better since receiving an injection and it appears that he was also administered an injection in the shoulder area which provided him relief. The impression was

22

right supraspinatus tendinitis, degenerative joint disease of the knee, and controlled diabetes. Dr. Genovese indicated that plaintiff could lift fifty pounds and he imposed no climbing restrictions. (Tr. pp. 277, 295).

On August 2, 2007, plaintiff advised Dr. Genovese that the shoulder injection had only helped him for a few days and that his blood sugar levels had recently spiked. The impression was out-of-control diabetes with the dosage of insulin being increased and Byetta being added to his medication regimen. (Tr. pp. 278, 294). Plaintiff returned to Dr. Genovese on August 27, 2007 and reported that the Byetta was a big help but his blood sugar level was greatly increased. Plaintiff's weight had dropped to 269 pounds. Dr. Genovese characterized plaintiff's diabetes as out-of-control. A low carbohydrate diet was discussed. (Tr. pp. 278, 294).

Plaintiff was next seen by Dr. Genovese on January 9, 2008 for complaints of right knee pain. He had exhausted his supply of Byetta which was refilled and the dosage was increased. (Tr. pp. 276, 293). Blood testing done on January 17, 2008 revealed plaintiff's glucose to be high at 169. (Tr. p. 311). Plaintiff reported feeling much better on January 23, 2008 except for right knee and left shoulder pain. His glucose level had decreased significantly in the previous few days, his weight was down to 262 pounds, and he was experiencing less numbness in the feet with the

use of Topamax.  Plaintiff had been unable to complete a stress test secondary to knee pain.  The impression was degenerative joint disease, controlled diabetes, and diabetic neuropathy.  Naprosyn was prescribed. (Tr. pp. 275, 292).  Plaintiff also underwent a comprehensive dilated eye exam by Dr. Charles Thomas on this date which was unremarkable with no evidence of diabetic retinopathy. (Tr. p. 306).

Plaintiff's glucose level had gone down further when he was next seen by Dr. Genovese on February 21, 2008 but he had been eating too much and his weight had increased to 279.5 pounds.  The impression was diabetes and degenerative joint disease. (Tr. pp. 275, 292).  On March 31, 2008, plaintiff underwent nerve conduction studies which revealed abnormal sensory findings for the right upper extremity and abnormal motor findings for the lower extremities.  The findings were suggestive of a neuropathy in the right upper extremity and a mild bilateral L5-S1 radiculopathy. However, a polyneuropathy was ruled out. (Tr. pp. 300-305). Plaintiff saw Dr. Genovese again that day and reported that the numbness in his feet was better but had not fully resolved. Plaintiff's weight was up to 283 pounds.  An MRI of the lumbar spine was ordered. (Tr. p. 291).  That study was attempted but cancelled on April 4, 2008 due to plaintiff's habitus. (Tr. p. 299).  The MRI was successfully completed on April 8, 2008 and it

revealed multi-level degenerative disc disease and facet arthropathy resulting in central canal stenosis at L3-4, L4-5, and L5-S1. (Tr. p. 298). Those findings were reported to Dr. Genovese and plaintiff complained that the worst pain was in his right shoulder when he was next seen by the doctor on April 16, 2008. The only abnormal finding reported on physical examination was that the right supraspinatus tendon was tender. Plaintiff was advised that he could take a total of 6 Tylenol per day for pain relief. (Tr. p. 290).

On April 16, 2008, Dr. Genovese also completed a "Physical Capacity Evaluation (PCE)" form that had been furnished to him by plaintiff's attorney. There, Dr. Genovese checked off the appropriate boxes on the form to indicate that plaintiff could stand, walk, and/or sit for less than 1 hour per 8-hour workday; could occasionally and frequently lift/carry less than 10 pounds; could use his hands for repetitive simple grasping and handling; could never bend, kneel, squat, crawl, or climb stairs or ladders; and could not reach above shoulder level. These limitations were attributable to severe lumbar spinal stenosis and severe arthritis in the shoulders and knees. Dr. Genovese checked off additional blanks on the form to indicate that plaintiff had an extreme limitation in his ability to perform activity within a schedule, maintain regular attendance, and to be punctual with customary

tolerances; had an extreme limitation in his ability to complete a normal work day and work week without interruptions from medically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and, had a marked limitation in his ability to handle stress. (Tr. pp. 286-288).

As noted above, plaintiff challenges the Commissioner's decision to deny him Social Security benefits on 2 grounds.  In the first of those, plaintiff alleges that the ALJ failed to properly evaluate the opinions of his treating physician.  More specifically, plaintiff alleges that the ALJ erred in giving little weight, rather than controlling weight, to the opinions set forth in the PCE form that Dr. Genovese completed on April 16, 2008.

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion.  <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir. 2000)(quoting <u>Paul v. Shalala</u>, 29 F.3d 208, 211 (5th Cir. 1994), <u>overruled in part on other grounds by Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080 (2000)).  A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown.  <u>Newton</u>, 209 F.3d at 456 (citing <u>Brown v. Apfel</u>, 192 F.3d 492, 500 (5th Cir. 1999) and <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994), <u>cert. denied</u>, 514 U.S. 1120, 115 S.Ct. 1984

(1995)).  Good cause exists when the treating physician's opinions
are so brief and conclusory that they lack persuasive weight, when
they are not supported by medically acceptable techniques, or when
the evidence supports a different conclusion.  Newton, 209 F.3d at
456; Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995); Bradley
v. Bowen, 809 F.2d 1054, 1057 (5th Cir. 1987); Scott v. Heckler, 770
F.2d 482, 485 (5th Cir. 1985).  The Regulations require the ALJ to
perform a detailed analysis of a treating physician's views under
the criteria set forth in 20 C.F.R. §§404.1527(d) and 416.927(d)
only in the absence of controverting medical evidence from other
treating and/or examining physicians.  Newton, 209 F.3d at 453.

Having carefully reviewed the administrative record in its
entirety, the Court believes that the ALJ gave the opinions that
Dr. Genovese recorded on the PCE form of April 16, 2008 the weight
that they deserved as being inconsistent with and unsupported by
his own treatment notes with the other evidence that was received
in the proceedings below.  As an initial matter, the PCE form
itself was unaccompanied by any contemporaneously-recorded,
medically acceptable findings and is thus entitled to little weight
on that basis alone.  Warncke v. Harris, 619 F.2d 412, 417 (5th Cir.
1980).  Despite the extensive limitations that were recorded by Dr.
Genovese on the PCE form, when plaintiff was evaluated by the
doctor earlier that day the only adverse finding noted on physical

27

examination was tenderness to the supraspinatus tendon. Plaintiff was advised that he could take up to 6 Tylenol daily for pain relief and by the time of the administrative hearing his medications included only Topamax for his neuropathy and Naprosyn. The usage of such limited pain relief modalities is not indicative of someone who is unable to perform any work activities whatsoever and the mere existence of pain or the fact that an individual is unable to work without experiencing pain is not an automatic ground for obtaining Social Security benefits. Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1995)(citing Jones, 702 F.2d at 621 n. 4). Moreover, although plaintiff has undoubtedly been seen over the years for right knee and left shoulder pain, Dr. Genovese indicated on the form that the limitations that he was suggesting were due to severe arthritis in both of the shoulders and both of the knees.

In addition, on the form Dr. Genovese indicated that plaintiff could not lift/carry 10 pounds on even an occasional basis. This finding was contradicted by plaintiff himself who testified at the administrative hearing that he could lift and carry objects weighing 12 pounds. On June 28, 2007, when plaintiff was seen by the doctor to obtain a clearance to work, the doctor indicated that plaintiff could lift objects weighing up to 50 pounds. Between the latter date and the date that he executed the PCE form, Dr. Genovese saw plaintiff on 6 separate occasions. The first 2 of

28

those, in August of 2007, were for management of plaintiff's diabetes which was then out-of-control. Right knee pain was the presenting problem on January 9, 2008. Plaintiff's condition had improved, including improvement to his foot pain with the use of Topamax, when he was next seen by Dr. Genovese on January 23, 2008 but he was still complaining of right knee and left shoulder pain. The diagnosis on February 23, 2008 was diabetes and degenerative joint disease. Plaintiff's foot numbness had improved further by March 31, 2008. In none of the treatment notes that were executed in connection with those 6 office visits did Dr. Genovese place any limitations on plaintiff's activities or retreat from the opinion that he gave on June 28, 2007 that plaintiff could lift 50 pounds. The Court also recalls that plaintiff himself reported to Dr. Okoye that he could lift weights of up to 50 pounds.

In his written decision, the ALJ methodically discussed all of the evidence before him including that which was generated during plaintiff's brief hospital admission in November of 2004, records from his treatment at LKMC, the results of Dr. Okoye's consultative evaluation, records from the Ascension Medical Clinic and those of Dr. Genovese, and MRI and EMG/nerve conduction study test results. (Tr. pp. 13-17). In assigning diminished weight to Dr. Genovese's PCE findings, the ALJ also observed that the limitations set forth on the form were belied by plaintiff's admitted ability to perform

a wide range of normal daily activities.  He could attend to his own personal needs, grocery shop, cook, do laundry, sweep, and vacuum.  He supervised his young nephews 4 days per week, drove daily, and attended his son's sporting events, church, and movies. Other interests including growing tomatoes, helping his mother maintain her garden, occasionally going fishing, playing cards, reading, watching TV, and swimming.  Plaintiff's ability to engage in such activities is inconsistent with the extensive limitations set forth by Dr. Genovese on the PCE form and is not indicative of an individual suffering from limitations preclusive of all work activities.  See Anderson v. Sullivan, 887 F.2d 630, 632 (5th Cir. 1989); Chapparo v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987). See also Leggett v. Chater, 67 F.3d 558, 565 n. 12 (5th Cir. 1995)(ALJ may appropriately consider claimant's daily activities in determining his disability status).  The PCE form notwithstanding, plaintiff testified at the administrative hearing that none of his doctors had placed any restrictions upon his activities.  Leggett, 67 F.3d at 565.  To the contrary, in June of 2007, Dr. Genovese apparently endorsed plaintiff's return to work provided he did not have to lift greater than 50 pounds. Id. Specifically addressing Dr. Genovese's PCE form, the ALJ noted:

> [a]s for the opinion evidence, little weight is given to the assessment by the claimant's treating physician, Dr. Genovese on April 16, 2008.  (Ex. 9F).  The physician

indicated that the claimant could sit, stand, walk for less than an hour in an 8-hour work day and lift only 10 pounds with no bending, kneeling, squatting, crawling or climbing.  Such restrictions were due to severe lumbar spinal stenosis and severe arthritis in the shoulders and knees.   The undersigned finds that the doctor's assessment was conclusory, based solely on the claimant's subjective complaints and not supported by objective medical evidence.  In fact, there is a paucity of medical evidence of low back pain although there is an MRI of the lumbar spine showing some spinal stenosis.  His right knee problems have been noted in many of the clinic visits but not supported by objective evidence.  Above all, his activities of daily living enumerated in this decision belie the limitations mentioned in the assessment.   Under the provisions of SSR 96-2p, a treating physician's assessment is generally given controlling weight only when well supported by the medical records in terms of clinical and diagnostic findings.

The record fails to demonstrate that the claimant suffers with frequent or severe pain or other severe symptoms. The numbness in his feet responded to Topomax (sic).  His activities of daily living noted above certainly do not show an individual who is unable to work.  The claimant lives [with] and assists his 75-year-old mother.  He drives, supervises three young nephews, fishes, attends basketball games and other activities of his 16-year-old son, has a girlfriend, attends church, goes to the library and medical appointments and performs housework. Considering all of the evidence under the criteria of Regulations 303.1529 (sic), 416.929 and SSR 96-7p, allegations of frequent or severe pain or other severe symptoms cannot be credited.

In sum, the above residual functional capacity assessment is supported by the totality of the evidence and the claimant's testimony as to his activities.

(Tr. p. 17).

Subjective evidence and complaints do not take precedence over objective evidence.  See, e.g., Leggett, 67 F.3d at 565-66. Viewing

31

the record in its entirety, the Court believes that the ALJ gave Dr. Genovese's PCE findings the weight that they deserved. Id.

Plaintiff's second challenge to the decision is that the ALJ failed to account for the limiting effects of his obesity as required by SSR 02-1P.  On this point, the Court also disagrees.

The relevant Social Security Rulings ("SSR") provide that obesity, while no longer a stand-alone impairment set forth in the Listing of Impairments, can reduce an individual's occupational base for work activity in combination with other conditions.  Weary v. Astrue, 288 Fed.Appx. 961, 966 n. 2 (5th Cir. 2008); Beck v. Barnhart, 205 Fed.Appx. 207, 211-12 (5th Cir. 2006).  Just as in Beck, despite plaintiff's failure to specifically allege obesity as a disabling condition justifying an award of Social Security benefits, the ALJ independently recognized that it was a severe impairment, i.e., one that is more than a "slight abnormality." Anthony, 954 F.2d at 293; Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1986); Estran v. Heckler, 745 F.2d 340, 351 (5th Cir. 1984). In accordance with the applicable SSR, the ALJ then addressed the limiting effects of plaintiff's obesity, as follows:

> [t]he claimant is obese.  SSR, 02-1p provides guidance on evaluating obesity under the listings, as well as considering its functional effects. In this case, obesity is a medically determined impairment.  There is no longer a specific listing for obesity; however, an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the

32

requirements of a listing.  A listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing.  Obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.  The physical examination findings indicate that claimant is 5 feet, 10 inches in height and weighs 280 pounds.  It is not shown that claimant's body weight, in-and-of itself, specifically precludes movements and/or basic exertional activities nor has it been alleged that claimant has extra tissue inhibiting movement in any of his extremities.  While undoubtedly his body mass exacerbates his back, arthritic knee and diabetic condition, there is no indication that claimant has been compliant with his treating sources instructions regarding diet and exercise.  He does not exercise regularly or make reasonable efforts to control his food intake.  In fact, his weight increased from 239 pounds in July 2006 (Ex. 2F) to 280 pound at the time of the hearing and was even higher as claimant testified that he had lost 15-20 pounds.  Despite his weight, the claimant is capable of providing daycare for three children, takes them to the library, goes fishing, attends his son's basketball games, does housework like vacuuming, washing dishes, sweeping, and the laundry.  He grocery shops, attends church and drives his son to school daily.  He even grows tomatoes.  In sum, the evidence fails to support a conclusion that claimant's obesity results in limitations of work-related functioning that could be expected to preclude him from executing work activities within the sedentary exertional range.

(Tr. pp. 16-17).

The Administration's Medical Consultant found that plaintiff was cable of light-level work.  In light of his multiple impairments, the ALJ found, however, that plaintiff was only capable of performing a limited range of sedentary-level work in assessing his residual functional capacity.  The Court believes

33

that the ALJ's consideration of plaintiff's obesity in making that determination was supported by substantial evidence.  <u>Beck</u>, 205 Fed.Appx. at 211-12.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this <u>1st</u> day of <u>   March        </u>,2011.


ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

34